## Mullan *versus* Philadelphia and Southern Mail Steamship Company.

1. It is the duty of every employer to exercise reasonable care in providing his laborers with safe machinery, suitable tools and appliances, adapted to the uses for which they are designed.

2. Where a master places the entire charge of his business, or a distinct branch of it, in the hands of an agent, exercising no discretion and no oversight, the neglect by the agent of ordinary care in supplying and maintaining suitable instrumentalities, is a breach of duty for which the master is liable.

3. The risk which a laborer assumes of injury from the neglect of his fellow, is when they are co-operating in the same business, so that he knows that the employment is one of the incidents of their common service.

4. The plaintiff was engaged as a laborer, under a stevedore employed by the ship-owner, in unloading a vessel; the rope by which the load was raised was one that had been spliced by the mate before the arrival of the vessel at port, and was used as a "single fall," which was more liable to part than a "double fall." Whilst raising a cask, the rope parted at the splice, the cask fell and injured the plaintiff. Whether the stevedore was a fellow-workman of the plaintiff, and whether the negligence of the mate in splicing the rope was a risk assumed by the plaintiff, were, under the circumstances, for the jury.

5. It was proper for plaintiff to ask of a witness if, at or immediately after the accident, he heard the stevedore say anything concerning the rope or its insufficiency.

6. Hanover Railroad Co. v. Coyle, 5 P. F. Smith 396, followed.

January 12th 1875. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the District Court of *Philadelphia:* Of January Term 1873, No. 173.

This was an action on the case, brought April 28th 1871, by Samuel Mullan against the Philadelphia and Southern Mail Steamship Company.

[Mullan *v.* Philadelphia & Southern Mail Steamship Co.]

The plaintiff was one of a gang of men employed by a stevedore engaged by the defendants, to unload one of their vessels lying at a wharf in Philadelphia, on the river Delaware. Whilst raising two tierces of rice by a rope, the rope which had been spliced, parted at the splice. One of the tierces fell into the hold of the vessel where the plaintiff was at work, rolled upon his arm, and so injured it that it had to be amputated. The plaintiff, alleging that it was through the negligence of the defendants' servants that he was injured, brought this action.

The case was tried November 2d 1872, before Mitchell, J.

The plaintiff having given evidence of the facts above stated, called J. McLaughlin, who testified that one Corcoran was the chief stevedore; he employed and discharged the men, but they were paid by the agent of the company; the men received their orders from Corcoran alone; he had the exclusive control and direction of them; there was no interference with him by any one. On the day of the accident, the vessel was being unloaded "by a single fall—a single fall is where a pulley is attached to a gang-rope, and a rope passes over the pulley to one end of which is the load to be raised, and the other end is attached to the donkey-engine." The rope was of the best kind; it had been spliced with a long splice, by which the rope where it is spliced is no thicker than it was originally. The rope had been used all day. The accident occurred about seven o'clock in the evening. The load was being taken from the bottom of the hold; it was rolled to the forward hatch, where it was hooked to the fall, raised to the deck and rolled out to the wharf. A weight on a single fall is apt to untwist the rope; the rope that parted was not sufficient, as a single fall, to unload two tierces of rice; it should have been used as a double fall, but there was not enough of this rope to weave a double fall. After the accident, a double fall was made from another rope. Two tierces at a time were taken by Corcoran's orders. It was his business to judge how much should be put on the fall.

Henry Gerber, who was in charge of the engine and hoisting apparatus, testified: * * *

"A single fall will unload a vessel twice as rapidly as a double cargo fall, but it takes nearly twice as much engine power. In a single fall it takes as much power of the engine to haul the load as the load weighs, and a little more to overcome the friction. A short splice in a rope is double the size of the rope unspliced. * * * It is the twist, or, as we call it, the lag of the rope that keeps the woven strands of either splice in their place. A long splice is as good as a short splice so far as the breaking strength of the rope is concerned; where a long splice runs over a pulley the pieces where the ends are tucked in will chafe against the pulley's side—that is its only objection. * * * When a spliced

[Mullan *v.* Philadelphia & Southern Mail Steamship Co.]

rope is so used that a heavy weight is on one end, the rope will untwist, and the more it does that the more likely is the splice to come apart. When a single cargo fall is used, the weight at one end has a tendency to make the rope untwist; that is, if the weight is allowed to swing round, as it will naturally do. But where a double fall is used, both ends of the rope are made fast, and there can be no untwisting of the lag of the rope." * * *

Hugh Kennedy testified as to the accident and its circumstances, and as to Corcoran's control, &c., and, on cross-examination, said further: "After the accident, we rove another fall, a double fall, within ten or fifteen minutes. I have followed the sea in merchant vessels. The running rigging is in the mate's charge. At this port, I believe vessels are discharged by stevedores who have charge of the tackle for this. The mate attends to receiving the rigging, and the stevedore judges of its fitness and uses it or not as he sees proper."

The plaintiff testified: "I was employed as a stevedore by Corcoran, and was then working under him. Nobody had power but Corcoran to give directions to me. He was my boss. He had the power to dismiss me. He had entire control of the men, and we recognised no one else. When the rope parted, I was in the hold of the vessel rolling tierces into the hatch and chocking them up. We were working pretty sharp, and I was in the act of rolling up a barrel into the hatch, and of putting a chock under it, in order to have it in place when the clamps should come down, when the two tierces being hauled up fell, and one of them struck the barrel I was rolling up, and from that bounced and rolled on to my hand and arm. * * * Corcoran did no work himself. He superintended the men under him, and gave them their orders. No one else gave orders. * * * Corcoran had charge of the machinery and tackle of unloading and loading. I have seen machinery and tackle changed by his direction. While a vessel was discharging, he had constantly the charge of it. I never knew any one else to have charge."

The plaintiff was asked: "Did you hear any expression from Corcoran at the time of the accident, or immediately after it, concerning this rope or concerning its insufficiency?"

This was objected to by defendants. The objection was sustained and a bill of exceptions sealed.

The plaintiff having closed, the defendants moved for a nonsuit, on the ground that Mullan and Corcoran were fellow-workmen; and, admitting the accident to have been caused by the latter's neglect, the defendants could not be made legally responsible.

The court ordered a judgment of nonsuit.

The plaintiff moved the court in banc for a rule to take off the nonsuit, which was refused, Mitchell, J., delivering the opinion of the court, viz:—

[Mullan *v.* Philadelphia & Southern Mail Steamship Co.]

" In this case the facts were that the plaintiff on the 26th October 1870, while employed by the defendants as a stevedore, and working in the hold of the steamship Wyoming, owned by the defendants, was injured by the fall of two tierces of rice, which were being hoisted from the hold to between decks, whence they were to have been discharged over the ship's side. The immediate cause of the accident was the parting of the rope used for hoisting. This rope had been spliced by the mate, who had charge of the ship's running rigging, while coming up the river. The splice drew out without breaking, and the casks fell upon the plaintiff. At the time of the accident the chief stevedore employed by the defendants had charge of the unloading of the vessel. The question is, whether the defendants are responsible for the injury received by the plaintiff. * * *

" It was insisted that the defendants were responsible upon two grounds: first, because they were bound to furnish proper and safe tools and appliances for the use of persons engaged in their service; and secondly, because the employment of the plaintiff being in a subordinate capacity to that of the head stevedore, the plaintiff was not within the operation of the principle that the servant assumes the risk of the negligence of his fellow servant. In other words, that the plaintiff was not a fellow servant of the head stevedore, but subject to his control and amenable to his orders.

" If a master negligently provides unsafe machinery, tools or implements for his servant to work with, he is answerable for the consequences.

" But this rule, like every other, has its just limits and qualifications, without which the rule itself would be an intolerable burden. If the master provides proper and safe machinery and tools, and employs a competent and prudent person to take charge of them, whose duty it is from time to time to inspect them, put them in order and renew their defective parts, he cannot be justly answerable for an accident to a fellow servant, arising from the negligence of such person. Without this reasonable exception to the rule of responsibility, it would be too severe for the business relations of life and most oppressive in its operation. It would in many cases abrogate entirely the general rule that the master is not responsible to his servant for the negligence of his fellow servant. It would make the employer an insurer against accidents, which no foresight or prudence of his could possibly foresee or prevent: Ryan *v.* Cumberland Valley Railroad Co., 11 Harris 354. * * * The particular negligence alleged in that case, was in omitting to hook safely the cars of a railroad train, a species of negligence which it is difficult to distinguish in principle from that which caused the accident in the present case.

" The employer is bound to furnish proper and safe machinery, but where he is obliged from the nature of the business to employ

[Mullan *v.* Philadelphia & Southern Mail Steamship Co.]

agents to run it, and to take care of it, and to keep it in proper repair, he is not responsible, unless he commits the charge to an incompetent or untrustworthy person. Upon the contrary principle, every employer must be held to warrant every bolt or pin, or screw, or piece of mechanism used, although he himself knows nothing of the machine, or does not understand its structure, or is incapable of appreciating the conditions of danger. He must be held to warrant not only that everything is good and sufficient when he supplies it, but that it shall continue so. And this not to a stranger, but to a person who is daily conversant with the risks of the business, and who, upon entering upon it, must of necessity know that his safety depends as much upon the capacity and watchfulness of his fellow workmen as upon his own. * * *

"If the unfortunate accident which was the cause of the present action was caused by negligence, it is plain that the negligence was either the remote negligence of the mate in making an imperfect splice, or the proximate negligence of the head stevedore in not examining the rope with sufficient care before he commenced the unloading of the vessel. But how could the owners know anything of that, unless they were informed of it? Is a ship-owner bound to examine personally every day, every rope in his ship, at the peril if he does not, of heavy damages to the persons in his employ resulting from the negligence of other persons in his employ, who are necessarily intrusted with such things? We must go to this extent if we are to hold the defendants responsible in the present case.

"Nor was there anything in the position of the plaintiff which relieves him from the operation of the general rule. He was a fellow servant in the same general employment. * * * That Corcoran, the head stevedore, was above the plaintiff, who worked subject to his orders and under his directions, makes no difference. The rule is not altered by the fact that the servant to whom the negligence is imputed was a servant of superior authority, whose directions the plaintiff was bound to obey. * * * There are cases in which persons have been so completely substituted in all respects to the place of the master, exercising in his stead a general and complete authority and control over the whole business, that they are regarded to all intents and purposes as principals and not fellow servants—masters substituted in the room of other masters. But the present case cannot be likened to them in any respect."

The plaintiff took a writ of error; he assigned for error:—

1. Rejecting his offer of evidence.

2, 3. Ordering judgment of nonsuit, and refusing to take it off.

*H. Hanson* and *D. Dougherty*, for plaintiff in error.—The principle that the doctrine *respondeat superior* does not apply when the injury arises from the negligence of a fellow workman,

[Mullan *v.* Philadelphia & Southern Mail Steamship Co.]

is subject to the exception where a fellow workman is by the common master put in his place: Ashworth *v.* Stanwix, 3 El. & El. 701; Clarke *v.* Holmes, 7 Hurlst. & N. 937; Grizzle *v.* Frost, 3 Foster & Finl. 622; Hall *v.* Johnson, 3 Hurlst. & C. 589. A master who employs a servant in dangerous work is bound to take all reasonable precautions for his safety: Patterson *v.* Wallace, 1 Macqueen (H. L.) 748; Barton's Hill Coal Co. *v.* Reid, 3 Id. 266; Weger *v.* Penna. Railroad, 5 P. F. Smith 460; O'Donnell *v.* Allegheny Valley Railroad, 9 Id. 239; Ardesco Oil Co. *v.* Gilson, 13 Id. 146. A corporation can act only through an officer, and his negligence is theirs: Frazier *v.* Pennsylvania Railroad Co., 2 Wright 104.

*M. P. Henry*, for defendants in error.—The master is not liable to one in his employ for an injury by his negligence to his fellow servant unless he so withdraws from the conduct of the business as to put the fellow servant in his place; and if he furnishes safe machinery, &c., and competent superintendents, the master has done his duty: Ardesco Oil Co. *v.* Gilson, 13 P. F. Smith 146; Caldwell *v.* Brown, 3 Id. 453; Ryan *v.* Cumberland Valley Railroad, 11 Harris 384; Weger *v.* Penna. Railroad, 5 P. F. Smith 460. A foreman is not in the position of a deputy master: Searle *v.* Lindsay, 11 C. B. N. S. 429; Gallagher *v.* Piper, 16 Id. 671; Albro *v.* Agawam Can. Co., 6 Cush. 75; Wright *v.* N. Y. Central Railroad, 11 Sm. App. 562. The company do not warrant that good material shall be properly used, or that the servants shall keep it in its original safe condition: Hard *v.* V. & C. Railroad, 32 Vt. 473; Leaver *v.* Railroad, 14 Gray 466.

Mr. Justice WOODWARD delivered the opinion of the court, February 15th 1875.

The accident resulting in the injury of which the plaintiff complains, occurred while he was employed as one of a gang of stevedores in unloading the steamship Wyoming, belonging to the defendants. In hoisting two tierces of rice out of the hold of the vessel, the rope the workmen were using parted, and the casks fell on the plaintiff. The hands employed were under the charge of John Corcoran, the chief stevedore. He engaged and discharged them at his pleasure. He had charge also of the machinery used in unloading the ship. The rope, where it parted, had been spliced; it was used, as the witnesses explained, as a single fall; the weight at the end caused it to swing round and untwist, and the parting at the splice was the result. On the ground that the injury was the consequence of the negligence of Corcoran, and that he was a fellow workman of the plaintiff, the court below directed a nonsuit.

There was evidence which would ordinarily be referred to a jury

that the rope was unfit for the purpose for which it was used. While it was not asserted that its strength was weakened by splicing, the witnesses united in saying that it should have been used as a double fall, and that there was not enough of it for that purpose. One of them said, that "where a long splice runs over a pulley, the pieces where the end are tucked in will chafe against the pulley's sides;" and that "when a spliced rope is so used that a heavy weight is at one end, the rope will untwist, and the more it does that the more likely is the splice to come apart. When a single cargo fall is used, the weight at one end has a tendency to make the rope untwist, that is, if the weight is allowed to swing round, as it will naturally do. But where a double fall is used, both ends are made fast, and there can be no untwisting of the lag of the rope." Another witness, after stating the liability of the lumps in a long splice to chafe in going through a pulley, said: "In unloading the rice, I think a single fall with a splice ought not to have been used."

In order to warrant the nonsuit, it was requisite that it should appear affirmatively, not only that the accident was caused by neglect of duty on the part of Corcoran, but that he and the plaintiff held the relation to each other of servants in the common employment of the defendants. Admittedly, it is the duty of every employer of laborers to exercise reasonable care in providing them with safe machinery, suitable tools and appliances adapted to the uses for which they are designed. Did the defendants discharge their duty? On their part, it is insisted that they did. It is said that they intrusted Corcoran with the power to select all the machinery necessary for the work he was employed to superintend. The testimony on this subject that is found in the bill of exceptions consists first, of the statement of Kennedy on cross-examination, that "the running rigging is in the mate's charge; the mate attends to receiving the rigging, and the stevedore judges of its fitness, and uses it or not as he sees proper;" and secondly, of the plaintiff's own statement, that "Corcoran had charge of the machinery and tackle of unloading and loading; I have seen machinery and tackle changed by his direction." In the opinion of the court below, it is said that "this rope had been spliced by the mate who had charge of the ship's running rigging, while coming up the river." It is assumed that the fact is so, and is contained in a portion of the testimony that has been overlooked.

It is conceived that the questions in this case were not such as could legitimately be passed upon finally by the court. Assuming, in the first instance, that Corcoran had entire control of the selection of the machinery, and that, consequently, the defect was one for which he was chargeable, it is difficult to see why the plaintiff should not have been permitted to ask the jury to find

[Mullan *v.* Philadelphia & Southern Mail Steamship Co.]

that the defendants had conferred on him such unlimited authority as to make him their representative, and to make themselves responsible for his default. "Where the employer leaves every thing in the hands of a middle-man, reserving to himself no discretion, then the middle-man's negligence is the master's negligence, for which the latter is liable:" Wharton's Law of Negligence, § 229; Grizzle *v.* Frost, 3 Foster & Finlayson 622. The principle that the master is exempt from responsibility to the servant for injuries received from the ordinary dangers of his employment, including the negligence of his fellow servants, is too deeply imbedded in our law to be disturbed. But where a master places the entire charge of his business, or a distinct branch of it, in the hands of an agent, exercising no discretion and no oversight of his own, it is manifest that the neglect by the agent of ordinary care in supplying and maintaining suitable instrumentalities for the work required, is a breach of duty for which the master should be held answerable. The negligence of the agent, with such powers, becomes the negligence of the master. In this case there was some evidence that the entire duty of providing the appliances for loading and unloading the vessels of the defendants, had been intrusted to the discretion of Corcoran. And just to the extent to which the proof went in fixing upon him the responsibility for the selection of the rigging and for adjusting and working it, did the same proof tend to establish the fact contended for by the plaintiff, that Corcoran was clothed, as to these duties, with the ultimate power and authority of the defendants. Upon the evidence submitted, it was the right of the plaintiff that a jury should pass.

If, in the next place, it should be found that the position of Corcoran, notwithstanding that he had charge of the gang of stevedores, was that merely of a fellow workman of the plaintiff; that the rope had been spliced by the mate on the voyage from Savannah; and that Corcoran received it without knowledge of the defect that caused the accident, the question would be presented whether the plaintiff would still be affected by the rule exempting the master from liability. The risk of injury which a laborer assumes is that involved in the "circle" of his employment. "He and the fellow servant causing the injury must be co-operating in the same business, so that the former knows that the employment of the latter is one of the incidents of their common service:" Wharton's Law of Negligence, sect. 230. And the question that would be presented would manifestly be one of fact. A jury would be required to find whether the negligence of the mate was one of the risks which the plaintiff should be held to have assumed. The result would depend on what should be ascertained to be their relations to each other, the extent to which they were brought into contact, and to which they were engaged in a common

[Mullan *v.* Philadelphia & Southern Mail Steamship Co.]

employment, and the connexion of the duties of each with the duties of the other.

It is not designed in any way to impair or affect the rule settled in the cases on which the court below relied. If it shall appear, in the event, that it was the duty of Corcoran to select the proper materials for the work that was to be done, that he held only the position of a fellow workman of the plaintiff, and that it was an act of negligence on his part to receive the rope from the mate and use it, the facts, of course, would bar all right of recovery in this action. The cases which were the guide in the decision below, under the circumstances disclosed in them, were justly ruled, undoubtedly; but they do not reach the questions presented here. The error consisted, not in adhering to the authorities, but in withdrawing from the jury the right to ascertain the cause of the accident, the relation in which Corcoran stood to the parties, and, if the accident was caused by the neglect of the mate, the responsibilities to which the plaintiff was subject as an incident of his employment in common with the mate, in the service of the defendants.

The offer to ask the plaintiff whether he heard any expression by Corcoran at the time of the accident, or immediately after it, concerning the rope, or concerning its insufficiency, ought, on the authority of The Hanover Railroad Company *v.* Coyle, 5 P. F. Smith 396, to have been received as part of the *res gestœ.*

Judgment reversed, and *procedendo* awarded.